Opinion filed April 14,
2011

 

                                                                       In The

                                                                              

  Eleventh
Court of Appeals

                                                                   __________

 

                                                         No. 11-09-00257-CV

                                                    __________

 

 

                            RACHEL MARIE STEWART, Appellant

 

                                                      
     V.

        

                          
JASON WILLIAM STEWART, Appellee

 



 

                                  On
Appeal from the County Court at Law

 

                                                            Nolan
County, Texas

 

                                                   Trial
Court Cause No. CC-5839

 



 

M
E M O R A N D U M   O P I N I O N

This
is a divorce proceeding.  The trial court granted Jason William Stewart and
Rachel Marie Stewart a divorce, named them joint managing conservators of their
three children, gave Jason the exclusive right to designate the children’s
residence, and divided the couple’s property.  Rachel filed this appeal,
complaining of the trial court’s conservatorship ruling and property division. 
We affirm.

 

I.  Facts

This
was a contentious proceeding with both parties concentrating primarily on their
criticisms of the other.  There was evidence that Rachel was guilty of
financial mismanagement before and during the marriage.  Before the marriage, Jason
paid some of her bills; she applied for phone service under her three-year-old
son’s name (he was from a prior relationship); and tax liens were filed against
her.  These liens still have not been paid.  Rachel admitted writing several
hot checks during the marriage.  Jason testified that he has spent $100,000
covering those checks.  When Jason filed for divorce, the parties separated.  During
their separation, Rachel failed to make the house payment, resulting in a
default, and she also failed to pay for day care. Rachel testified that she
thought Jason had made the January house payment and that she did not know the
February payment was due.  She acknowledged, however, that the statements were
sent to her.  During the separation and despite the fact that she was earning
only $8.00 an hour and the parties had considerable outstanding debts, she
traveled to Las Vegas, the Fort Worth Stock Show, the San Antonio Stock Show, the
Houston Stock Show, and the San Angelo Stock Show. She also paid someone $600 a
month to wash, feed, and handle her steers, and she renovated a bathroom in the
house.

There
was testimony of infidelity and alcohol abuse by both parties.  During a
birthday party for her at Mi Ranchito Restaurant, Rachel became extremely intoxicated. 
A band was playing at the restaurant, and Rachel ended up passed out in the
backseat of a band member’s pickup.  On another occasion, she and Jason went to
the Scurry County Christmas Ball.  The same band was playing.  She became
severely intoxicated, and after the ball, she went to a hotel with the band and
ended up in a bathroom with a band member.  A third episode occurred at the ranch
rodeo.  Rachel became intoxicated and told Jason to go away because she was
leaving with the band.  Jason went home and packed some clothes.  According to
him, Rachel brought the children to him the next day so that she could sleep
off a hangover.  A mutual friend of the parties witnessed her assault Jason and
cause problems for himself and his ex-wife at a restaurant while intoxicated.

At
the time of trial, Rachel was having an affair with a married man, Robert
Butchee.  A few months before the divorce, Rachel went to Lamesa, where Butchee
lived, to purchase show pigs.  She should have returned between 9:30 and 10:00
in the evening, but she did not arrive until after midnight.  When she did, she
was highly intoxicated.  There was a twenty-pack of Miller Lite beer in her
vehicle, and according to Jason, 75% of the bottles were empty.  Miller Lite is
the type of beer that Butchee drinks.  Rachel admitted that she met with
Butchee at the Houston Stock Show and that he provided her with money for her
trips.

There
was also evidence critical of Jason.  He admitted to drinking beer while driving
with the kids in his vehicle.  Prior to this divorce action, the parties had
filed for divorce and were separated.  Jason admitted that, during this period of
time, he had an affair with one woman and slept with another.  He also admitted
that, a few days before their originally scheduled divorce hearing, Rachel
caught him looking at pornography on the internet.  Rachel denied that this was
a remote event and contended that it happened much more recently.

The
court had other evidence of bad acts by both parents.  Rachel did not attend
her grandmother’s funeral because she was at the National Finals Rodeo in Las
Vegas.  The date of the funeral was changed while she was out of town, but she
knew that her grandmother had passed away before leaving town.  Rachel has
interfered with the relationship between her oldest son and his father and has
been chastised by the trial court for doing so.  On one occasion when the trial
court ordered her to allow the father access to his son, she told him to be the
biggest brat he had ever been.  She has told the children that Jason did not
love them and has cussed him out in their presence. 

The
children’s family physician described Jason as temperamental and said that he
loses his temper easily.  He has heard Jason raise his voice with the children
and, in fact, has never had anyone else act as poorly as Jason did with the
children in his office.  Jason has written several checks when there were
insufficient funds in his checking account.  He incurred $575 in insufficient
funds fees one month and $925 the next.  Once, while Rachel was driving on the
interstate, he turned her car off.  He admitted to striking her in the face
once and to forging her name on a bank note.  Rachel testified that he has
bruised the children by spanking them and that he has called her horrible names
in front of them.

II.  Issues

Rachel challenges the trial court’s judgment with two
issues.  She contends that the trial court abused its discretion by giving
Jason the exclusive right to designate the children’s residence because its
decision was based on legally and factually insufficient evidence and that it
also abused its discretion by failing to consider the tax consequences of
awarding her wind energy royalty income that had been pledged to pay a
community debt.

III.  Standard of Review

We
review a trial court’s decision on custody, control, possession, and visitation
matters as well as division of the community estate for abuse of discretion and
reverse the trial court’s order only if we determine from reviewing the record
as a whole that the trial court abused its discretion.  Gillespie v.
Gillespie, 644 S.W.2d 449, 451 (Tex. 1982).  A trial court abuses its
discretion only if it acts arbitrarily or unreasonably, without reference to
any guiding rules or principles.  Owens-Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998). 

Under
an abuse of discretion standard, legal and factual sufficiency challenges to
the evidence are not independent grounds of error but are relevant factors in
assessing whether the trial court abused its discretion.  Child v. Leverton,
210 S.W.3d 694, 696 (Tex. App.—Eastland 2006, no pet.).  When, as here, the
appellant contends the abuse of discretion results from insufficient evidence,
we engage in a two-pronged inquiry:  (1) whether the trial court had sufficient
information on which to exercise its discretion and (2) whether the trial court
erred in its application of discretion.  Id.  The traditional
sufficiency review comes into play with regard to the first question; however,
the inquiry does not end there.  We then proceed to determine whether, based on
the evidence, the trial court made a reasonable decision.  Id. 

In
a legal sufficiency review, we view the evidence in a light favorable to the
finding, crediting favorable evidence if a reasonable factfinder could do so
and disregarding contrary evidence unless a reasonable factfinder could not.  City
of Keller v. Wilson, 168 S.W.3d 802, 827 (Tex. 2005).  The evidence is
legally sufficient if it would enable reasonable and fair-minded people to
reach the verdict under review.  Id. at 827-28. We may sustain a
no-evidence challenge only when (1) the record discloses a complete absence of
evidence of a vital fact, (2) the court is barred by rules of law or
evidence from giving weight to the only evidence offered to prove a vital fact,
(3) the only evidence offered to prove a vital fact is no more than a mere
scintilla, or (4) the evidence conclusively establishes the opposite of a vital
fact.  Id. at 810.  In reviewing the factual sufficiency of the
evidence, we examine all of the evidence and set aside a finding only if it is
so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust.  Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986).

The
best interest of the child is the primary consideration in determining issues
of conservatorship.  Tex. Fam. Code Ann.
§ 153.002 (Vernon 2008); In re V.L.K., 24 S.W.3d 338, 342 (Tex.
2000).  Because the trial court faces the parties, observes their demeanor, and
has an opportunity to evaluate the claims made by each parent, the trial court
has wide latitude in determining the child’s best interest.  Gillespie,
644 S.W.2d at 451.  When addressing conservatorship issues, courts may use the
non-exhaustive list of Holley factors to determine the child’s best
interest.  See Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976).  The
Holley factors include the following:  (1) the desires of the child, (2)
the emotional and physical needs of the child now and in the future, (3) the
emotional and physical danger to the child now and in the future, (4) parental
abilities of the individuals involved, (5) programs available to those
individuals to promote the best interest of the child, (6) plans for the child
by these individuals, (7) stability of the home or proposed placement, (8) acts
or omissions of the parent that may indicate that the existing parent-child
relationship is not proper, and (9) any excuse for the acts or omissions of the
parent.  Id.

IV.  The Right to Designate the Children’s Primary
Residence

Rachel argues that, when the trial court
decided to give Jason the right to designate the children’s primary residence,
it had insufficient evidence upon which to inform its exercise of discretion. 
The trial court made a number of findings of fact in connection with this
decision.  Specifically, the court found:

            a. 
Jason William Stewart can best provide for the physical, psychological and
emotional needs of the children.

 

           b.  The
incidents of Rachel Marie Stewart’s alcohol use pose a potential physical
danger to the children now and in the future.

 

           c.  The
stability of Jason William Stewart’s home is marginally better than that of
Rachel Marie Stewart.

 

           d.  Jason
William Stewart has demonstrated a greater ability to give the children first
priority.

 

           e.  Neither
Jason William Stewart nor Rachel Marie Stewart have the ability to reach shared
decisions in the best interest of the children.

 

           f.  Jason
William Stewart and Rachel Marie Stewart have both engaged in corporal
punishment and exhibit tendencies to anger quickly.

 

           g.  Jason
William Stewart and Rachel Marie Stewart have both, at one time or another,
been the primary caregiver for the children in the absence of the other parent.

 

            h. 
No evidence was presented to rebut the presumption that the siblings should not
be separated.

 

            i. 
Neither Jason William Stewart nor Rachel Marie Stewart presented credible evidence
of their stability to promote a positive relationship between the children and
the other party.

 

            j. 
There have been instances of family violence, involving the use of abusive
physical force between the parents, if not in the presence of, then in the
immediate proximity of the children.

 

            k. 
Rachel Marie Stewart’s continued abuse of alcohol denotes an ongoing alcohol
problem that relates to the Respondent’s fitness to act as a parent.

 

            l. 
Rachel Marie Stewart had an (extramarital) affair with a married individual
during the time of the marriage and continuing during the period of separation.

 

            m. 
Rachel Marie Stewart has engaged in conduct denying and/or interfering with the
parenting time provided to the father of her older child who is not the subject
of this suit.

 

Rachel
challenges several of these findings.  For example, she acknowledges that there
was evidence of alcohol abuse but points out that none of the events occurred
around the children and that Jason admitted to drinking a beer while driving
with the children.  However, there was evidence that at least one of the
children was present at Rachel’s birthday party while she was drinking tequila
straight from the bottle.  Furthermore, Jason testified that Rachel, while
intoxicated, drove with the children on three or four occasions.  The trial
court could find this testimony credible.  But even if the children did not
actually witness Rachel while intoxicated or ride with her while she was impaired,
the events evidencing her alcohol abuse were so dramatic as to provide the trial
court with cause for concern.  Jason’s admission that he drank beer while
driving with the children is also disconcerting, but the trial court could draw
a distinction between it and Rachel’s alcohol abuse because of the lack of
evidence that Jason was ever impaired.  

Rachel
also challenges the trial court’s finding that Jason’s home was marginally more
stable than hers, and she complains that this finding is unclear.  We note
first that Rachel did not request additional findings and, therefore, has not
preserved any complaint about the clarity of this finding.  Moreover, the trial
court had sufficient evidence upon which to make this finding.  In addition to
the alcohol abuse and financial mismanagement evidence, the court had evidence
that Rachel was unable to maintain constant employment.  She held a number of
different jobs during the marriage, was unemployed for eight months, and eventually
went to work for EON adjusting land damage.  She was fired from that job and,
at the time of trial, was working as a receptionist.  She was earning $8.00 an
hour but had taken off “quite a bit” from work.  Finally, she was involved in
an affair with a married man.

Rachel
next challenges the trial court’s finding that Jason demonstrated a greater
ability to make the children his first priority.  Rachel assumes that this
finding was the result of her failure to attend her grandmother’s funeral.  If
so, she notes that the date of the funeral was changed after she left town and
that the children were taken care of in her absence.  The parties were
separated, and Rachel left the children with Jason.  The trial court could
consider that Rachel knew her grandmother had passed away before she left town but
that she chose to go to the National Finals Rodeo nonetheless – even though she
lacked the financial resources to make such a trip.  The trial court could also
consider that Rachel applied for credit in her three-year-old son’s name and
that, while the parties were separated, she made several trips to stock shows
without the children.  Rachel’s absences, her decision to go to Las Vegas, and her
spending money that she did not have could all reasonably be considered by the
trial court as evidence of her priorities.  If so, the trial court’s finding
has adequate support.

The
trial court found that Rachel had an affair with a married man both during the
marriage and during the parties’ separation.  Rachel does not dispute this finding
but points out that Jason had two affairs and that he was looking at internet
pornography while she was pregnant.  Jason testified that his two affairs and
his internet pornography viewing occurred during the parties’ first separation. 
Rachel disputed Jason’s testimony and contended that he has looked at
pornography much more recently, but the trial court could reasonably find
Jason’s testimony more credible.  The trial court could also distinguish between
an affair during a period of separation and one that started during the
marriage.  

Finally,
Rachel challenges the sufficiency of the evidence that she interfered with her
oldest son’s visitation with his father.  Rachel admitted that she had been to
court several times over visitation issues concerning her son, that she had
been reluctant to promote a relationship between her son and his father, and
that she had been chastised for not allowing visitation.  Jason testified that
Rachel had denied the father access and that the trial court had ordered her to
provide him with access.  Jason also testified that, after that hearing, Rachel
told her son to throw a fit when he did not get his way.  This evidence is
sufficient to support the trial court’s finding.

Between
the undisputed evidence and the conflicting evidence that could be resolved in
Jason’s favor, the trial court had sufficient evidence upon which to make each
of the challenged findings of fact.  Collectively, the findings sufficiently
informed the trial court’s exercise of its discretion.  Issue One is,
therefore, overruled.

V.  Wind Energy Royalty

Rachel
complains that the trial court abused its discretion by dividing the community
property because she was awarded one-half of the wind royalty income.  Her
complaint is that, because the royalty is pledged to secure a mortgage, she
does not actually receive it but is still taxed on it.  Rachel contends that
the trial court failed to appreciate the tax consequences of its division and
that this division could result in an inequitable property division.

Texas
law requires trial courts to divide the estate of the parties in a manner that
is just and right, having due regard for the rights of each party.  Tex. Fam. Code Ann. § 7.001 (Vernon
2006).  There is no requirement that the court effectuate an equal division.  Murff
v. Murff, 615 S.W.2d 696, 699 (Tex. 1981).  In reviewing the equitable
remedy fashioned by the trial court, we must determine not only whether the
trial court’s findings are supported by the evidence, but also whether error,
if established, caused the trial court to abuse its discretion.  Garcia v.
Garcia, 170 S.W.3d 644, 649 (Tex. App.—El Paso 2005, no pet.).  We must
indulge every reasonable presumption in favor of the trial court’s proper
exercise of its discretion in dividing marital property.  Pletcher v. Goetz,
9 S.W.3d 442, 446 (Tex. App.—Fort Worth 1999, pet. denied).

The
initial concern Rachel’s argument presents is her criticism of the trial court
for not considering evidence she did not offer.  There was testimony about the
parties’ liability for past taxes, but neither party offered the trial court
any tax consequence evidence.  Consequently, we do not know what the tax
consequences to her will be or how they affect the division of the marital estate. 
Second, because Jason will have the same imputed income, the record does not
reflect disparate treatment.  Third, Rachel herself testified that she was
aware the royalty income was pledged.  She then asked the court to split that
income.  Consequently, she is complaining of an award that she requested.[1] 


Finally,
Rachel offers no suggestion for what the trial court should have done beyond consider the tax consequences of the wind royalty award.  The parties had assets
totaling $1,514,388 and liabilities totaling $1,470,425.50.  Jason received an
estate with a negative net equity (-$8,357.50).  Rachel received an estate with
a positive net equity ($52,320).  The wind royalty is pledged to pay a mortgage
on land Jason is receiving, but he is also responsible for the majority of the
parties’ debt, including past taxes of $56,626.  The trial court treated Rachel’s
share of the pledged royalty income, $60,909.50, as a contribution to the
parties’ general unsecured debt but made Jason primarily responsible for that
debt.  Because Rachel is receiving a disproportionate share of the marital
estate and is primarily responsible for less than 15% of their debt, we cannot
conclude that the trial court abused its discretion by awarding her one-half of
the wind royalty.  Issue Two is overruled.

VI.  Conclusion

The judgment of
the trial court is affirmed.  

 

            

RICK STRANGE

                                                                                    JUSTICE

 

April 14, 2011

Panel consists of:  Wright, C.J.,

McCall, J., and Strange, J.









                [1]We note that the wind royalty income is pledged to pay
an indebtedness on farm land and that Rachel also asked for one of the parties’
two farm tracts.  Her request for one-half of the royalty income was not
conditioned upon receipt of a farm tract.